UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                                             :
JAMES BUMPUS,                                :
                                             :
                          Petitioner,        :
                                             :      **MEMORANDUM AND ORDER**
          - against -                        :
                                             :      1:97-cv-1791-ENV
SUPERINTENDENT OF CLINTON                     :
CORRECTIONAL FACILITY,                        :
                                             :
                          Respondent.        :
                                             :
-----------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

☆     SEP 0 7 2007

P.M.
TIME A.M.

VITALIANO, D.J.

     Two young men were arrested for the robbery and murder of the same victim. The two were
later indicted for the same crimes by the same grand jury in the same true bill. The two were then
prosecuted in the same courtroom at the same time, confronting the same witnesses before the same
trial judge and jury. Both were convicted at the same moment and each received the same sentence.
Any trial error or infirmity in the evidence as to one was equally error and infirmity as to the other.
Both appealed. When the appellate process concluded, the indistinguishable co-defendants met very
different fates.

     The root explanation for their variable fates lies in the fact that New York permits co-
defendants to pursue separate and independent appellate tracks. Initially, their attorneys separately
raised the same issues on direct appeal. The Appellate Division affirmed the conviction of the first
defendant and, four months later, affirmed the conviction of the second, citing the reasoning of the
earlier decision. From this point, the co-defendants' paths diverged. The first defendant, proceeding

*pro se*, sought leave to appeal to the New York Court of Appeals ("Court of Appeals"), presenting only one of the claims raised to the Appellate Division. His application was denied. The second defendant, represented by a law professor who had taken the case *pro bono*, presented all of the claims that had been raised to the Appellate Division, and he was granted leave to appeal. Ten months later, on the basis of evidence improperly admitted as to both defendants, the Court of Appeals reversed the conviction of the second defendant. The first defendant then sought reconsideration from each of the courts that had heard his case – the New York Supreme Court, Appellate Division, and Court of Appeals. Each of these appeals was met with a summary denial. He then turned to this Court, petitioning in 1997 for a writ of habeas corpus on the ground, among others, that his continued imprisonment on this conviction, in light of the reversal of his co-defendant's conviction, was repugnant to the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

For the reasons set forth below, this Court finds that all but one of petitioner's claims are procedurally barred from federal habeas review because they were not fairly presented to the Court of Appeals. The remaining claim, that the courtroom was improperly closed during trial, does not merit habeas relief. Accordingly, the writ is denied and the petition is dismissed.

## BACKGROUND

I.     **Indictment and Trial**

James Bumpus and co-defendant Rodney Russ were charged, under Kings County Indictment Number 3566/85, with robbing and fatally shooting Hector Rodriguez at the Fort Greene Housing Project in Brooklyn, New York on the evening of June 13, 1984. The indictment charged two counts

2

of murder in the second degree (N.Y. Penal Law § 125.25(1), (3)), robbery in the first degree (N.Y. Penal Law § 160.15(4)), and criminal possession of a weapon in the second and third degree (N.Y. Penal Law §§ 265.02(4), 265.03).

The indictment was based principally upon the grand jury testimony of two teenaged eyewitnesses, Karen Lawrence and Leana Gonzalez, whose testimony before and during trial would waver under competing pressures. The two girls and their families lived in the same housing project as the co-defendants and their families. They did not come forth immediately with their testimony. Almost a year had passed when they happened to be visiting their local police precinct on an unrelated matter and a police officer familiar with the Rodriguez murder questioned them. Lawrence and Gonzalez conceded to the officer that they had seen Bumpus and Russ trying to rob the victim on the night of the murder. Before a grand jury, Lawrence testified that she had seen Bumpus and Russ hold down and search Rodriguez immediately before the fatal shot was fired. Gonzalez similarly testified to the grand jury that she had seen Bumpus holding a gun to Rodriguez's head, Russ searching Rodriguez's pockets, and that she had left when the fatal shot was fired.

As trial approached, the two young women attempted to recant their grand jury testimony by giving a defense investigator written statements denying that they had seen who had shot Rodriguez. Shortly before trial, however, Gonzalez expressed her intention to stick with her earlier grand jury testimony when she told the Assistant District Attorney ("ADA") assigned to the case that the testimony was, in fact, true.

At trial, the prosecution first called Lawrence, who testified that she had not seen the murder and had not even seen Bumpus or Russ at all on the night of the murder. This testimony being

3

unquestionably inconsistent with Lawrence's grand jury testimony, the court held a sidebar conference, at which the prosecutor stated:

> This witness, for a year approximately after the homicide, never came forward to speak to the police. The first time I met her, in June of 1985 at the Grand Jury, she indicated to me that she was deathly afraid of members of the families of both defendants. Indeed, she indicated that before testifying in a trial in this case she would like no longer to be living in the area, and asked me to assure her that her name would never be made known to the defendants or their family until commencement of the trial and until they had been moved, her family.
>
> The courtroom is packed with people who I know to be relatives of both defendants. This witness, five minutes before entering the courtroom, affirmed the veracity of her Grand Jury testimony, indicated she was afraid to testify in front of members of their families, but that these two defendants shot and killed Hector Rodriguez.
>
> I think what very clearly has occurred, the witness has taken the stand, looked in the audience, seen many people who she knows, and is now afraid to truthfully testify.

(Tr. 43:11-44:18.)[1] Russ's attorney responded, "[i]t's been my information that no member or any one of my client's family has threatened or coerced her to make her change her story. On the contrary, I heard that the District Attorney and the investigators and the detectives on the case have been at these witnesses for the last two weeks, or something like that. They've been threatened with perjury, they've been threatened to go to jail for five years." (Tr. 45:22-46:6.) Following the sidebar conference, the prosecutor impeached Lawrence, without objection from defense counsel, by reading her inconsistent grand jury testimony to the jury. Before allowing any further questioning, the court

---

[1] Citations to "Tr." refer to the trial transcript.

adjourned the proceedings for the day and assigned counsel to Lawrence.

On the following day of trial, the court held a hearing outside the presence of the jury to address whether Lawrence would assert her Fifth Amendment privilege against self-incrimination. The prosecutor requested that the courtroom be closed for the hearing, pointing out that, just five minutes before testifying, Lawrence had made statements inconsistent with her trial testimony. The prosecutor added that "it's my personal belief that this witness, as a result of being confronted with many people in the courtroom who she knows, that that fact has effected [sic] the willingness of the witness to testify truthfully." (Tr. 108:24-109:5.) The prosecutor also asserted that the defendants' family members were, in fact, present in the courtroom. Over objection from counsel for both defendants, the court ruled: "I have every reason to believe that the witness is being terrorized by the presence of these spectators, and during the hearing, I will order that all spectators leave the courtroom." (Tr. 110:25-111:5.) The trial court allowed Lawrence's father to remain in the courtroom.

Outside the presence of the jury, Lawrence asserted her Fifth Amendment privilege against self-incrimination in response to questions about her prior statements. The prosecutor contended that Lawrence could not assert her Fifth Amendment privilege because she had already let the cat out of the bag: "She has testified in a particular way, and the only thing she can do through additional testimony is to either leave her position as it was, or to improve it. I don't believe that the . . . assertion of any Fifth Amendment privilege at this time would be a benefit to this witness. She's made her bed." (Tr. 117:6-12.) The court disagreed, deciding that Lawrence could properly invoke the privilege. (Tr. 118:22-24.) The prosecutor then requested and received a ten minute recess to

speak with his supervisors about whether he could grant Lawrence immunity as to prior instances

of perjury. (Tr. 119.) At the conclusion of the recess, the following exchange ensued:

| | |
|---|---|
| The Court: | Let the record indicate that all counsel and both defendants are again present. |
| | What do you wish to do? |
| Mr. Cohen: | Judge, I'm about to learn from Miss Lawrence what she's going to do in a second. If she's still interested in invoking the Fifth Amendment, I will ask you to grant us a continuance until tomorrow morning when I believe I'll have an application. |
| The Court: | All right. Do you mind advising the Court of your position? |
| Mr. Cohen: | Judge, the witness is speaking with her attorney and her father. I have asked her what she's going to do when she gets on the witness stand. She still hasn't told me. I'm going to ask her one more time, and then I'm going to ask for a continuance until tomorrow morning at which point we will reevaluate our position, if necessary. |
| The Court: | Why do you need all these continuances? I'm anxious to resolve the matter. |
| Mr. Cohen: | I think the matter is going to resolve itself, your Honor. |
| The Court: | I don't think it's necessary to put the witness back on the stand. Let's just ask her attorney what her position is. |
| Mr. Cohen: | Okay, Judge. |
| Mr. Fabricant: | Your Honor, your Honor directed that the courtroom be cleared. It's not clear, Judge, |

|  |  |
|---|---|
|  | there's two detectives sitting back there. |
| The Court: | Nothing is happening at this point. |
| Mr. Fabricant: | Your Honor, just as the District Attorney felt that relatives or friends of the defendant are a threatening factor to this witness, I feel that the two detectives sitting in the back of this courtroom are likewise a threatening factor. |
| The Court: | All right. Will you ask the two detectives to leave. |
| Mr. Cohen: | Yes, Judge. |
| . . . . |  |
| The Court: | It's now a quarter to five. I can't see any reason for holding the jury any longer. Before I let them go, I'd like to know what the district attorney's position is under these circumstances? |
| Mr. Cohen: | With respect to what, Judge? |
| The Court: | With respect to Karen Lawrence. |
| Mr. Cohen: | Judge, Karen Lawrence is about to be summarily arrested. |
| The Court: | I'm not interested in that. I'm interested in this trial. |
| Mr. Cohen: | I will tell you tomorrow morning what my position is. I don't know now. I do not know. There will be either movement tomorrow morning or an application by me tomorrow morning, one way or the other. |
| . . . . |  |
| Mr. Fabricant: | Your Honor, the witness, Karen Lawrence, is still theoretically on the witness stand. I |

> would ask that your Honor direct the district attorney and any other law enforcement officials, be precluded from talking to her about her testimony.

Mr. Cohen: Judge, at this point I have no intention of discussing her testimony with her.

The Court: All right. Miss Lawrence is directed not to discuss her testimony with anyone except her lawyer. That doesn't mean she can't talk to them.

(Tr. 120:05-124:24.)

In its decision on the appeal of petitioner's co-defendant, the Court of Appeals described what happened next to the 17-year-old Lawrence. She was "(1) arrested; (2) charged with perjury; (3) taken in handcuffs crying and frightened to the District Attorney's office; (4) interrogated and threatened with 2 to 7 years in prison; (5) removed to Central Booking for fingerprinting; (6) held until 5:00 a.m. the next morning without sleep; (7) moved to a precinct lockup; and (8) returned to court at 9:00 a.m. where she was kept in handcuffs except for her time on the stand. Lawrence's postarrest and postincarceration testimony, tending to inculpate [Russ] by describing his role in the mugging, resulted immediately in the perjury charges being dropped. She was only then released from police custody." People v. Russ, 79 N.Y.2d 173, 176-77, 581 N.Y.S.2d 152, 589 N.E.2d 375 (1992).

In explaining why she had earlier testified untruthfully, Lawrence responded, "I was just afraid." (Tr. 141:20.) On cross-examination, she conceded, however, that neither the defendants nor their families had ever threatened or scared her. On re-direct, she explained that she was frightened someone in the Fort Greene Housing Project would hurt her because of her testimony.

8

Before the second eyewitness to the shooting, Leana Gonzalez, took the stand, the court granted her immunity. The prosecutor questioned Gonzalez outside the presence of the jury, and Gonzalez "made it unquestionably clear and certain that she did not see defendant[s] in the hallway on the night of the shooting and would not give substantive testimony against [them] at the trial." Russ, 79 N.Y.2d at 177. Before the prosecution called Gonzalez to testify, Bumpus's counsel objected:

> I expect Mr. Cohen to attempt, under section 60.45 of the Criminal Procedure Law, to attempt to introduce for the purposes of attacking the witness's credibility prior sworn statements and that she had given testimony favorable to the prosecution.
>
> I would object to that, Judge, on the grounds that the District Attorney knows what the witness is going to say now.
>
> This is not a situation where as he claimed Miss Lawrence five minutes before she took the stand told him that she was going to testify that the defendants committed a crime. Here the District Attorney knows that Leana Gonzalez is going to testify contrary to the District Attorney's positions, and it would seem to me since that element of surprise is lacking, that it would be improper for the District Attorney to attempt to invoke 60.45 of the Criminal Procedure Law for the sole purpose of introducing the Grand Jury testimony and whatever sworn statements he has to attack the witness's credibility.
>
> He is putting her on the witness stand knowing, knowing that she's going to testify contrary to his position. We all know, and your Honor must charge the jury, that these prior sworn statements cannot be used as evidence in chief. I think what the District Attorney contemplates is that the jury might disregard your Honor's charge to them.
>
> We're in a different situation, Judge, than we were with Karen Lawrence.
>
> . . . .

9

> Here we have sworn testimony just a few minutes ago as to –
> what the witness is going to say. The only purpose of the District
> Attorney putting this witness on is to introduce her Grand Jury
> testimony to discredit his own witness and hope – and I suspect Mr.
> Cohen hopes that the jury disregard your charge that they may not
> consider the Grand Jury testimony as evidence in chief.

(Tr. 18:20-20:4; 29:23-30:8.) The court took a short recess to consider the objection, and upon

returning, stated in relevant part:

> The Court:     It seems to the Court that although the older rule
> seems to make more sense, the rule as indicated in
> People against Vega, that now our Appellate Division
> in this Department is authorizing what the District
> Attorney seeks to do by calling Leana Gonzalez,
> knowing that she's going to testify as she did at the
> hearing, and then impeaching her pursuant to 60.35,
> by using her Grand Jury testimony in the
> impeachment process.
>
> I am now of the opinion, after reading these cases, that
> our appellate courts have indicated that this may be
> done.
>
> . . . .
>
> As a result, I'm going to permit the District Attorney
> to call her as a witness fully expecting that she will
> testify as she did at the hearing.
>
> I'm doing the best I can to follow the law as I believe
> it to be.

> Mr. Fabricant: I have no doubt about that.

> The Court:     I think by ruling as I have, I am following the law as
> set forth by various appellate courts as indicated
> before.

> Mr. Fabricant: I except.

> The Court:     I could be wrong. I've been wrong before, but I'm

10

> doing what I believe is right, and under all the
> circumstances I'm now prepared to proceed.

Mr. Fabricant: I respectfully except to your Honor's ruling.

Mr. Kirsch:    I join in that.

(Tr. 29:2-32:3.) The Court of Appeals accurately described the scene: "Faced with Gonzalez's

determined decision not to cooperate and her predictable refusal to give testimony, the People

nevertheless, over objection, called Gonzalez to the stand with their no-lose, fall-back strategy of at

least presenting her grand jury testimony against defendant to the petit jury for the purported purpose

of attacking her credibility." Russ, 79 N.Y.2d at 177.

It played out to no one's surprise: Gonzalez failed to implicate either defendant, and the

prosecutor then impeached her with her earlier grand jury testimony and her subsequent statement

to an ADA confirming the truth of the grand jury testimony. Even after being impeached, Gonzalez

maintained that her trial testimony was true. The trial court charged the jury that Gonzalez's prior

contradictory statements were to be considered for the limited purpose of determining her credibility.

After hearing all the evidence, the jury convicted Bumpus and Russ of felony murder, N.Y.

Penal Law § 125.25(3). The Supreme Court sentenced both defendants, on December 4, 1986, to

terms of imprisonment of 25 years to life.

II.    **Appellate Process**

A.    *Bumpus's Initial Appeals*

Bumpus appealed his conviction to the New York Supreme Court, Appellate Division,

Second Department, raising the following ten claims: (i) the prosecutor improperly impeached Karen

Lawrence and Leana Gonzalez with their prior grand jury testimony; (ii) the prosecutor coerced

11

Karen Lawrence into testifying against appellant; (iii) on direct examination the prosecutor improperly elicited that Karen Lawrence had made a prior inconsistent statement because of fear; (iv) the prosecutor improperly elicited that Karen Lawrence had made a prior consistent statement; (v) the prosecutor became an unsworn witness against the appellant; (vi) the court improperly closed the courtroom to all spectators; (vii) it was improper to elicit that a witness declined to be polygraphed; (viii) improper remarks by the prosecutor deprived appellant of a fair trial; (ix) based upon the evidence in chief, appellant was not proven guilty beyond a reasonable doubt; and (x) cumulative errors deprived the appellant of a fair trial.

On July 16, 1990, the Appellate Division affirmed Bumpus's conviction, finding that "defendant's contention that the People improperly used the Grand Jury testimony of two prosecution witnesses for impeachment purposes on direct examination is not preserved for appellate review."[2] People v. Bumpus, 163 A.D.2d 484, 558 N.Y.S.2d 587 (2d Dep't 1990). The court also rejected the claim on the merits: The witnesses' testimony had affirmatively damaged the prosecution's case, thus entitling the prosecution to cross-examine those witnesses with their earlier contradictory testimony. Id. Further, Bumpus's courtroom closure claim was rejected by the Appellate Division since there were sufficient facts in the record to support the trial court's decision to briefly close the courtroom during a hearing on whether Lawrence would assert her Fifth Amendment privilege against self-incrimination. Id. It concluded finally that the trial evidence was legally sufficient to support a guilty verdict and that all other claims were "either unpreserved for

---

[2] This finding is an overstatement. While Bumpus's counsel did not object to the prosecution impeaching Lawrence with her prior grand jury testimony, he very clearly objected to the similar impeachment of Gonzalez.

appellate review or without merit." Id. at 484-85 (internal citation omitted).

By letter dated August 1, 1990, addressed to the Clerk of the New York Court of Appeals, Bumpus's appellate counsel requested leave to appeal from the Appellate Division's affirmance of Bumpus's conviction. Attached to counsel's letter were copies of the Appellate Division's decision and the briefs submitted to the intermediate appellate court. The letter raised no specific grounds for appeal and requested that New York's high court refrain from acting on Bumpus's application because the Appellate Division had yet to decide the similar appeal of Bumpus's co-defendant, Russ. Counsel indicated his intention to move the Appellate Division for reconsideration of Bumpus's appeal to coincide with its consideration of Russ's appeal.

Just one week later, however, by letter dated August 8, 1990, petitioner submitted a *pro se* application for leave to appeal to the Court of Appeals. The letter, addressed to Chief Judge Sol Wachtler, raised only Bumpus's courtroom closure claim. Bumpus neither mentioned any other claims nor attached the briefs submitted to the Appellate Division. The record does not show that Bumpus's counsel submitted any additional documentation to the Court of Appeals, nor does it show that counsel had been relieved. Notwithstanding the absence of clarity in the record, on September 26, 1990, on behalf of the Court of Appeals, Associate Judge Joseph W. Bellacosa denied Bumpus's application for leave to appeal to that court. People v. Bumpus, 76 N.Y.2d 891, 561 N.Y.S.2d 553, 562 N.E.2d 878 (1990).

B.    *Russ's Appeals*

On November 5, 1990, the Appellate Division affirmed the conviction of Bumpus's co-defendant Russ, noting that it had already "reviewed and affirmed Bumpus's conviction," and "in

13

so doing . . . rejected the arguments raised in this appeal concerning the alleged improper use of Grand Jury testimony of prosecution witnesses for impeachment purposes, the closure of the courtroom to spectators in order to conduct a brief hearing, as well as the sufficiency and weight of the evidence and we find that these contentions similarly lack merit within the context of the present appeal." People v. Russ, 167 A.D.2d 361, 562 N.Y.S.2d 444 (2d Dep't 1990). On April 3, 1991, however, Judge Bellacosa granted Russ's application for leave to appeal the Appellate Division's affirmance of his conviction. People v. Russ, 77 N.Y.2d 966, 570 N.Y.S.2d 500, 573 N.E.2d 588 (1991).

On February 25, 1992, the Court of Appeals reversed Russ's conviction and ordered a new trial. People v. Russ, 79 N.Y.2d 173, 179, 581 N.Y.S.2d 152, 589 N.E.2d 375 (1992). The court held that "the admission of Gonzalez's Grand Jury testimony engendered serious prejudice which was exacerbated by the manner in which the trial and 'testimony' proceeded with respect to the other teenage witness, Lawrence." Id. at 176. The Court of Appeals specifically relied upon its prior decision in People v. Fitzpatrick, 40 N.Y.2d 44, 386 N.Y.S.2d 28, 351 N.E.2d 675 (1976), where it had similarly condemned, under N.Y. Crim. Proc. Law § 60.35, the practice of calling a witness solely for the purpose of impeaching the witness with prior inconsistent grand jury testimony; "[t]o permit impeachment under such circumstances would be to allow a bootstrap procedure clearly transgressing any balancing of interests the Legislature could have had in mind . . . ." Fitzpatrick, 40 N.Y.2d at 53.[3] A good deal of the Russ opinion condemns the prosecution's tactics with regard

---

[3] One federal court has opined that this sort of prosecution tactic "may trigger Due Process and Confrontation Clause concerns." Evans v. Verdini, 466 F.3d 141, 146 (1st Cir. 2006).

14

to the first teenaged witness, Lawrence, but the court stopped short of holding that Russ was denied

due process under either the New York or United States Constitution. Russ, 79 N.Y.2d at 179.

Judge Hancock wrote separately to emphasize that "[t]he People's conduct with the [sic] respect to

Karen Lawrence . . . is not a basis for the Court's reversal." Id. at 180. Russ subsequently pled

guilty to robbery in the first degree, N.Y. Penal Law § 160.15, and he was released from custody on

May 24, 1996.[4]

      C.    *Bumpus's Second Wave of State Court Appeals*

On March 9, 1992, Bumpus moved *pro se* for reconsideration of the Court of Appeals' denial

of his application for leave to appeal to that court. Bumpus claimed that he was entitled to have his

case reviewed by the Court of Appeals because he had earlier presented the same claims that the

court had relied upon in reversing the conviction of his co-defendant. By order dated June 15, 1992,

Judge Bellacosa granted the motion for reconsideration, but then adhered to his prior determination

that there was "no question of law presented which ought to be reviewed by the Court of Appeals."

People v. Bumpus, 80 N.Y.2d 829, 587 N.Y.S.2d 913, 600 N.E.2d 640 (1992).

On July 7, 1992, Bumpus, through his appellate counsel, moved in the Appellate Division

for reconsideration of his appeal in light of the Court of Appeals' decision in People v. Russ, 79

N.Y.2d 173. The Appellate Division summarily denied the motion on November 20, 1992. Bumpus

brought a similar *pro se* motion on August 29, 1994, which the Appellate Division denied on

---

    [4] After his release, Russ again found himself in trouble with the law. He was convicted of robbery in the first degree, N.Y. Penal Law § 160.15, and he is currently incarcerated at the Sing Sing Correctional Facility in Ossining, New York.

October 27, 1994.[5]

### D.    *Bumpus's Habeas Petition*

On March 18, 1997, Bumpus filed a *pro se* petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York. The petition addressed, at length, Bumpus's claim regarding the prosecution's introduction of Gonzalez's grand jury testimony; the same claim that had led to the reversal of Russ's conviction in the Court of Appeals. In a footnote, Bumpus asked that the habeas court also consider the nine other issues that he had raised when appealing to the Appellate Division.

By order dated April 9, 1998, United States District Judge Sterling Johnson, Jr. dismissed Bumpus's habeas petition as untimely under the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"). Bumpus v. Superintendent of Clinton Corr. Facility, No. 97-cv-1791, 1998 WL 178767 (E.D.N.Y. Apr. 9, 1998). By unpublished summary order dated March 4, 1999, the United States Court of Appeals for the Second Circuit reversed and remanded because of its intervening decision in Ross v. Artuz, 150 F.3d 97 (2d Cir. 1999), which gave habeas petitioners whose convictions became final before the enactment of AEDPA a grace period of one year from AEDPA's enactment – until April 24, 1997 – to file their petitions. Bumpus v. Warden, 173 F.3d 843 (Table), 1999 WL 132218 (2d Cir. 1999).

Respondent answered Bumpus's petition on June 7, 1999. On October 6, 1999, Bumpus

---

[5]   Bumpus also twice moved the New York Supreme Court, Kings County, to vacate his judgment of conviction, pursuant to N.Y. Crim. Proc. Law § 440.10. That court summarily denied both motions because Bumpus had raised issues that were appropriate for direct appeal and, thus, were barred from collateral review. See N.Y. Crim. Proc. Law § 440.10(2)(b).

moved for the appointment of counsel, which, in his order dated March 1, 2000, Judge Johnson granted. The docket shows no subsequent activity on Bumpus's case until October 10, 2004, when his court-appointed attorney submitted a supplemental memorandum of law, which addressed the same claims that Bumpus had raised in his initial *pro se* petition. The supplemental brief adds a new gloss to Bumpus's claim regarding the prosecution's introduction of Gonzalez's grand jury testimony, arguing that the Court of Appeals deprived Bumpus of his federal constitutional rights by denying him leave to appeal, while granting leave to and ultimately reversing the conviction of his identically-situated co-defendant, Russ.

By order dated April 22, 2005, Judge Johnson directed respondent to show cause why the petition should not be granted. On June 7, 2005, respondent submitted additional papers opposing Bumpus's petition. On March 29, 2006, Bumpus's petition was reassigned to this Court, then newly appointed to the federal bench. Oral argument was held on November 27, 2006 and, at the Court's direction, the parties have submitted additional briefing.

## STANDARD OF REVIEW

Under AEDPA, a writ of habeas corpus shall not issue with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication (1) was contrary to or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court delineated an analytical framework to guide review of habeas claims, identifying the need to treat independently the "contrary to" and "unreasonable

application" clauses of section 2254(d)(1). With respect to the "contrary to" clause, a writ may issue if the state court decision "contradicts the governing law set forth in [Supreme Court] cases" or arrives at a different conclusion from the Supreme Court on "materially indistinguishable" facts. Id. at 405-06. With respect to the "unreasonable application" clause, a writ may issue if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The "unreasonable application" inquiry, however, is limited, and the habeas court may only issue a writ where the state court's application of Supreme Court precedent was "objectively unreasonable." Id. at 409. "Some increment of incorrectness beyond error is required" for a decision to be considered objectively unreasonable, though the increment need not be great. Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000).

## DISCUSSION

I.    **Exhaustion**

A.    *Bumpus's Application for Leave to Appeal to the Court of Appeals*

Before a federal court may grant habeas relief to a petitioner in state custody, the petitioner must first exhaust his state court remedies. 28 U.S.C. § 2254(b)(1). Concerns of comity lie at the core of the exhaustion requirement, as it would be unseemly for federal courts to review and overturn state court convictions before allowing the state appellate process a fair opportunity to correct any error. O'Sullivan v. Boerckel, 526 U.S. 838, 844-45, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); Coleman v. Thompson, 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each

18

appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004). In New York, this means that the habeas petitioner must have raised the federal issue in an appeal to the Appellate Division and then in an application to the Court of Appeals for leave to appeal. Galdamez v. Keane, 394 F.3d 68, 74 (2d Cir. 2005).

Still, it is not always clear to a reviewing habeas court what claims a petitioner raised in state court. All applicants seeking leave to appeal to the Court of Appeals must submit, in addition to their application, a copy of the briefs filed in the Appellate Division. N.Y. Comp. Codes R. & Regs. tit. 22, § 500.20.[6] The Court of Appeals has never explained its practice for reviewing leave applications, and specifically, whether it considers issues addressed in the Appellate Division briefs, but not in the leave application itself. Given that leave denials are typically in the form of summary orders bare of even a hint of what claims were considered, the reviewing federal habeas court has no factual basis from which to determine whether a claim raised only in the Appellate Division briefs was actually presented to the Court of Appeals. In an effort "to defer to the competence of state courts," the Second Circuit has developed a body of law based "on a series of reasonable surmises regarding the behavior of the Court of Appeals in reviewing leave applications." Galdamez, 394 F.3d at 76 n.5.

In Grey v. Hoke, 933 F.2d 117 (2d Cir. 1991), a habeas petitioner, in seeking such leave, had submitted a letter mentioning only one of the three claims he had raised in his brief to the Appellate

---

[6] At the time when Bumpus sought leave to appeal to the Court of Appeals, this rule was contained in § 500.10, the predecessor to § 500.20.

19

Division, which as required, was attached to his letter. Id. at 120. The Second Circuit held that the two claims contained only in the brief were not fairly presented to the Court of Appeals – "[t]he fair import of petitioner's submission to the Court of Appeals, consisting of his brief to the Appellate Division that raised three claims and a letter to the Court of Appeals arguing only one of them, was that the other two had been abandoned." Id.

Jordan v. Lefevre, 206 F.3d 196 (2d Cir. 2000) presented a closer call. There, the habeas petitioner's state court attorney had submitted a letter to the Court of Appeals, "forcefully" arguing one claim for three paragraphs and then requesting in a fourth paragraph "that he be given permission to appeal '[f]or all of these reasons and the reasons set forth in his Appellate Division briefs.'" Id. at 198. From this language, it was not clear whether the applicant sought to raise the federal claims contained in his Appellate Division brief, but not specifically addressed in his leave application. The Second Circuit, noting that petitioner's counsel had the obligation of setting forth claims to the Court of Appeals, refused to adopt an expectation that the Court of Appeals would "comb through an applicant's appellate brief to seek and find arguments not expressly pointed out in the application for leave." Id. at 199. The Circuit held "that arguing one claim in [a] letter while attaching an appellate brief without explicitly alerting the state court to each claim raised does not fairly present such claims for purposes of the exhaustion requirement underlying federal habeas jurisdiction." Id. at 198-99.

On the other hand, Morgan v. Bennett, 204 F.3d 360 (2d Cir. 2000) illustrates that to "explicitly alert" the Court of Appeals to a federal issue, a leave application need not elaborate on claims contained within an attached brief; the application need only ask the Court of Appeals to

20

consider the issues contained within the brief. See Ramirez v. Attorney Gen. of N.Y., 280 F.3d 87, 97 (2d Cir. 2001). In Morgan, the habeas petitioner's state court attorney had submitted a leave application to the Court of Appeals, specifically requesting that the court "consider and review all issues outlined in defendant-appellant's [Appellate Division] brief and *pro se* supplemental brief." 204 F.3d at 369-70. The Second Circuit concluded that this incorporation by reference was sufficient to call the Court of Appeals' attention to the claims in the attached briefs. Id. at 370-71.

Yet, there was an added wrinkle in Morgan. After counsel submitted the initial leave application, he received a letter from the Clerk of the Court of Appeals informing him of the judge to whom Morgan's application had been assigned and requesting that any supplemental arguments be submitted directly to that judge in letter form. Id. at 370. Counsel submitted a follow-up letter to the assigned judge, discussing one issue and briefly referencing a second issue contained within the earlier-submitted briefs. Id. On habeas review, the District Court reasoned that counsel's second letter "specifically addressed only two of petitioner's claims in a way that clearly suggested that these were the only issues on which leave was sought." Id. The Second Circuit disagreed. Id. In addressing the total import of the letter application, attached briefs, and follow-up letter, the court held that the claims in the attached briefs had been fairly presented because: (i) counsel's initial letter application specifically requested that the Court of Appeals consider all issues contained within the briefs; (ii) counsel's follow-up letter was submitted after he had received a notice from the Court's Clerk that "supplemental" arguments should be sent directly to the judge handling the application; and (iii) the substance of the follow-up letter made clear that it was intended as a supplement. Id. at 371.

Most recently, the Second Circuit addressed the issue of leave applications and attached briefs in Galdamez v. Keane, 394 F.3d 68 (2d Cir. 2005). In Galdamez, the habeas petitioner's attorney, in seeking leave to appeal to the Court of Appeals, had submitted a terse letter, the body of which stated: "Enclosed please find copy [sic] of the decision of the Appellate Division affirming this conviction. The appellant hereby requests leave to appeal to this Court." Id. at 70. The petitioner's counsel then submitted a second letter, to which the Appellate Division briefs were attached, stating: "Enclosed please find briefs submitted to the Appellate Division together with the decision affirming the conviction." Id. Counsel submitted no further letters or materials. Id. at 71. The Second Circuit, apparently on the theory that less is more, concluded that, since the petitioner's application raised no specific issue, "the only 'fair import' of the total application suggests a request for review of all the issues argued to the Appellate Division." Id. at 76. Accordingly, for purposes of habeas review, all of the claims contained within the attached briefs had been fairly presented to the Court of Appeals. Id.

In the case before this Court, counsel's application to the Court of Appeals, dated August 1, 1990, tersely stated: "Enclosed please find a copy of Order of Appellate Division affirming the conviction of the appellant together with the briefs filed by the appellant and respondent. The appellant respectfully requests leave to appeal to this Court." Respondent's Exh. E. However, counsel's letter went on to explain his efforts to synchronize the appeals of Bumpus and his co-defendant, Russ. The leave application concludes that

> [w]ith regard to this request for leave to appeal I believe that in the
> interests of judicial economy it would be advisable to not make a
> decision on the Bumpus case until the Appellate Division considers
> the other case and then if need be leave to appeal for both cases can

22

be decided at the same time.

Id. Just one week later, on August 8, 1990, Bumpus submitted a *pro se* letter to Chief Judge Sol

Wachtler of the Court of Appeals and also directed the letter to the attention of the Court's Clerk.

The letter began:

> I am submitting this letter application for a certificate granting leave
> to appeal to the Court of Appeals from the order of the Appellate
> Division, Second Judicial Department, which affirmed my conviction
> of murder in the second degree. Among the issues raised on appeal
> to that court, was the issue of whether there was a violation of the
> Sixth Amendment of the United States Constitution and it's [sic]
> counterpart of Article I § 6 of the New York State Constitution where
> the court at *nisi prius* granted the prosecutor's request for closure of
> the courtroom without just cause, and without a proper showing of
> necessity.

Respondent's Exh. F. The letter went on to discuss Bumpus's courtroom closure claim exclusively

for three pages, concluding that "[t]he order of the appellate division which affirmed the judgment

of the Supreme Court, Kings County, should be reversed and a new trial ordered." Id. The record

shows no other correspondence between or among Bumpus, his counsel, and the Court of Appeals.

In considering whether the claims contained within Bumpus's brief to the Appellate Division

were fairly presented to the Court of Appeals, this Court is obliged to read Bumpus's two leave

applications together. The first letter, submitted by counsel, did not specifically address any claim;

it merely attached the Appellate Division briefs and requested that the court defer in acting on

Bumpus's leave application. The letter functioned, in essence, as an inartful request for a stay, and

its failure to raise any specific claims for review had the effect of focusing the Court of Appeals'

attention on the attached briefs, in their entirety. See Galdamez, 394 F.3d at 76. Unlike in

Galdamez, however, this was not the only letter before the Court of Appeals.

Here, as in <u>Morgan</u>, there were two letters submitted to the Court of Appeals in support of the leave application. 204 F.3d at 369-70. In <u>Morgan</u>, the second letter was clearly meant to supplement, and not to supplant, the earlier submitted letter application, leading to the conclusion that all claims advanced in the first letter had been fairly presented. <u>Id.</u> at 371. Bumpus's *pro se* letter, however, argues only the courtroom closure claim – at length. The letter makes no reference to, nor is it attached to, the Appellate Division briefs or the letter submitted by his attorney. The language of his letter makes clear that it was intended as an application, and not as a supplement to an application. ("I am submitting this letter application . . . .") Bumpus's letter was not, as in <u>Morgan</u>, addressed to the judge handling the application – Judge Bellacosa – but instead to the Chief Judge and Court Clerk. Finally, counsel's initial letter to the Court of Appeals did not explicitly request that the Court of Appeals review all claims contained within the attached briefs; in fact, it requested that the Court of Appeals defer in ruling on Bumpus's application altogether. Bumpus's letter was arguably a repudiation of counsel's earlier letter. At the least, the two leave applications should be read together, and in doing so, this Court concludes that the Court of Appeals was not fairly apprised of claims contained within the briefs attached to the first letter.[7] Nothing in counsel's letter directed the court to any specific arguments raised below, and Bumpus's letter "affirmatively directed the Court of Appeal's [sic] attention *away* from claims contained in the attached briefs." <u>Galdamez</u>, 394 F.3d at 76 (emphasis in original). In other words, the second letter added focus where there was none in counsel's original letter – assuming the first presented anything other than

---

[7]  The parties have not pointed to, and this Court has been unable to locate, any Court of Appeals rule addressing whether and when the Court of Appeals can or will consider an application from a party *pro se* following receipt of correspondence from counsel, where there is no apparent order releasing counsel from representation.

24

a request for a stay. This Court thus concludes that the only claim Bumpus fairly presented to the Court of Appeals was his courtroom closure claim.[8]

Accordingly, the claims contained within Bumpus's Appellate Division briefs on direct appeal are barred from habeas review by an independent and adequate state ground – specifically, the state court rule that an appellant gets one shot at raising his claims on direct appeal – and review by this Court on the merits is precluded unless the petitioner can demonstrate both cause and actual prejudice or, alternatively, that failure to consider the claim will result in a fundamental miscarriage of justice, i.e., petitioner may be "actually innocent." Brown v. Greiner, 409 F.3d 523, 532 (2d Cir. 2005). Neither of these grounds are met. A petitioner may attempt to show "cause" for failing to present a constitutional issue in state court by claiming that counsel was constitutionally ineffective. However, the Sixth Amendment right to counsel does not extend to a discretionary appeal to a state's highest court, and thus counsel cannot be constitutionally ineffective for failing to raise a claim to a state's highest court. Accordingly, this failure cannot constitute "cause" that would allow a reviewing habeas court to look past the failure. DiGuglielmo v. Smith, 366 F.3d 130, 135 (2d Cir. 2004); Williams v. Goord, 277 F. Supp. 2d 309, 317 (S.D.N.Y. 2003). Finally, petitioner presents no evidence that would suggest he is "actually innocent" and the record raises no doubts as to his guilt.

---

[8] To the extent that petitioner claims the New York Court of Appeals denied him equal protection on his direct appeal in comparison with Russ, his claim is baseless. State appellate courts may establish fair procedural rules for the presentation of claims. The disparate outcomes resulted not from an unfair application of a rule, but from the presentation of different issues for review. See United States ex rel. Hampton v. Detella, 39 F. Supp. 2d 1031, 1040 (N.D. Ill. 1998).

B.    *Bumpus's Motion for Reconsideration*

Next for review is whether adherence by the Court of Appeals, upon reconsideration, to its decision denying Bumpus leave to appeal constituted an adjudication on the merits of any claim that Bumpus had previously failed to raise to the Court of Appeals.  Under Court of Appeals' rules, a motion for reargument or reconsideration of a leave denial may not be granted "on the assertion for the first time of new points, except for extraordinary and compelling reasons."  N.Y. Comp. Codes R. & Regs. tit. 22, § 500.20(d).[9]  If the Court of Appeals passes over a procedural bar and decides the merits of a newly-raised claim, as its rules allow in extraordinary and compelling cases, the court's adjudication satisfies the exhaustion requirement of 28 U.S.C. § 2254(b).  See Greene v. Lambert, 288 F.3d 1081, 1086 (9th Cir. 2002) (citing Castille v. Peoples, 489 U.S. 346, 351, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989)).

Bumpus moved the Court of Appeals, on March 9, 1992, to reconsider its earlier denial of his leave application in light of the then-recent decision in Russ.  In his letter motion, Bumpus wrote that "the same allegations, contentions, and points of law raised by the Appellant Russ in his briefs before the Appellate Division, and the New York Court of Appeals were and are the same points raised by this appellant herein, James Bumpus."  Respondent's Exh. E.  Bumpus added that "[w]hile it is well understood that the appellant and his co-defendant selected to present indepentent [sic] briefs before the court, it must be further understood that they still infact [sic] brought the same argument before the Appellate Courts."  Id.  Bumpus concluded by requesting reconsideration "in that appellant herein should be afforded the same Due Process of Law that is afforded his co-

---

[9]  At the time when Bumpus brought his state court appeal, this rule was contained in § 500.10(b).

defendant." Id.

Judge Bellacosa's summary order does not specify whether he simply reconsidered Bumpus's earlier-submitted application for leave to appeal in light of Russ or whether he instead took the extraordinary step of reaching the merits of, but then summarily rejecting, a newly-raised claim – the very claim that he had relied upon in granting leave in and authoring the Court of Appeals' decision in Russ. This latter scenario cannot be the case. Bumpus's motion for reconsideration does not purport, in any way, to raise a new claim. Instead, Bumpus's letter motion claimed disparate treatment, and specifically, that Bumpus had earlier raised the same claim that the Court of Appeals had relied upon in reversing the conviction of his co-defendant. The letter requested "the same relief" and "the same due process" afforded to Bumpus's co-defendant, and nothing more. This Court simply cannot conclude that Judge Bellacosa granted unrequested extraordinary relief by considering a newly-raised claim and then, in the next stroke of his pen, denied the claim, though it was identical to another that he had granted relief on – all without explanation. Judge Bellacosa's adherence to his earlier decision reinforces this Court's conclusion – consistent with Second Circuit caselaw – that Bumpus had only presented his courtroom closure claim to the Court of Appeals. This Court must conclude, then, that on Bumpus's motion for reconsideration, the Court of Appeals did not address the merits of any claim that Bumpus had not earlier presented for review, *i.e.*, any claim other than his courtroom closure claim.

And the United States Constitution requires no more. The Equal Protection Clause does not require the identical outcome in state appeals arising from the same criminal case. Its purpose "is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination,

27

whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam) (citations omitted). Petitioner's plight is facially compelling, but it is inevitable that any appellate system which allows an individual to chart his own course will yield disparate results on similar facts due to differences in lawyering and issue presentment. Such differential outcomes are not inherently arbitrary. While certainly disquieting, the strange odyssey of parallel appeals here – one successful and the other not – itself affords no new due process or equal protection ground to save petitioner from his failure to fairly present to New York's high court the underlying claim he shared with his co-defendant, and upon which his co-defendant had won relief. In short, it is not a separate ground upon which a writ of habeas corpus can be granted.

## II.     **Courtroom Closure Claim**

A criminal defendant has the "right to a speedy and public trial." U.S. Const. amend. VI. "Essentially, the public trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings." Estes v. Texas, 381 U.S. 532, 588, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring). A public trial is a deterrent to the abuse of judicial power and to perjury by witnesses. See Waller v. Georgia, 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (citing In re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948)); see also In re Rosahn, 671 F.2d 690, 697 (2d Cir. 1982) (noting that purposes of the public trial requirement include "the need to assure accountability in the exercise of judicial and governmental power, the preservation of the appearance of fairness, and the enhancement of the public's confidence in the

judicial system"). The violation of a criminal defendant's constitutional right to a public trial is a structural error that is not subject to harmless error analysis. Neder v. United States, 527 U.S. 1, 37, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); Waller, 467 U.S. at 49-50; Carson v. Fischer, 421 F.3d 83, 94-95 (2d Cir. 2005). The public trial right "applies not only to the evidence phase of a criminal trial . . . but also to other adversary proceedings, such as a pretrial suppression hearing." Ayala v. Speckard, 131 F.3d 62, 69 (2d Cir. 1997) (en banc) (citations omitted).

A criminal defendant's right to a public trial is not, as the Supreme Court reminded in Waller v. Georgia, absolute and may give way to countervailing interests of justice. 467 U.S. at 45. Waller, which is the Supreme Court's most recent examination of limits to the public trial right, reaffirmed that "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." Id. (quoting Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)). Stated as a four-part test, "[1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, [4] and [the trial court] must make findings adequate to support the closure." Waller, 467 U.S. at 48.

In determining whether the four Waller requirements are met, a reviewing court must keep in mind the scope and duration of the courtroom closure. The Second Circuit has stated that "the sensible course is for the trial judge to recognize that open trials are strongly favored, to require

29

persuasive evidence of serious risk to an important interest in ordering any closure, and to realize that the more extensive is the closure requested, the greater must be the gravity of the required interest and the likelihood of risk to that interest." Ayala, 131 F.3d at 70; Woods v. Kuhlmann, 977 F.2d 74, 76 (2d Cir. 1992). Similarly, the Second Circuit has stated in a case "where the closure was brief and the testimony given during closure was merely corroborative," that the state's burden in advancing an interest warranting closure was "not a heavy one." Brown v. Kuhlmann, 142 F.3d 529, 538 (2d Cir. 1998); Bowden v. Keane, 237 F.3d 125, 129 (2d Cir. 2001).

As these statements of decisional law make clear, a court should not treat all closures identically, but should apply a "sliding scale approach." Bowden, 237 F.3d at 130. This point is critical here, where the closure which petitioner complains of was extremely brief, no trial testimony was given, and where the proceedings related to an ancillary matter – whether the state's witness, Karen Lawrence, would invoke her Fifth Amendment privilege against self-incrimination, and whether the court would accept her invocation of the privilege. Cf. id. (noting that the testimony put forth during the closure "was by no means essential to the government's case").

Turning then to the first Waller factor, this Court finds that the state clearly advanced an interest that warranted a very brief closure of the courtroom. One of two eyewitnesses to the crime – a 17 year old – had exposed herself to a perjury charge by completely abandoning her grand jury testimony, which she had reaffirmed to the ADA just moments before taking the stand. The witness had expressed fear to the ADA at the prospect of testifying in front of the defendants' families, who lived in her housing project. She had not volunteered her account of events for over a year after the incident, and even then had asked the ADA to relocate her family. The prosecution had an interest

30

in protecting its witness from intimidation and in securing her truthful testimony. See English v. Artuz, 164 F.3d 105, 108-09 (2d Cir. 1998); Woods v. Kuhlmann, 977 F.2d 74, 76-77 (2d Cir. 1992) (noting that the petitioner conceded that the "protection of a witness who claims to be frightened as a result of *perceived threats* meets both the 'substantial reason' and the 'overriding interest' standards") (emphasis added). The trial court also had an interest in protecting the minor witness from intimidation so that she could freely decide whether to assert her Fifth Amendment privilege, and so the court could obtain sufficient information to determine whether her invocation of the privilege was appropriate. Based on the facts in the record and the interests involved, it was not unreasonable for the court to determine that the first prong of Waller was met.

Nor is this Court's conclusion altered by the trial court's apparent reliance on statements made by the ADA that the witness was intimidated by the presence of the defendants' family members and friends. In Guzman v. Scully, 80 F.3d 772 (2d Cir. 1996), a pre-AEDPA case, the Second Circuit took issue with a courtroom closure where the state trial court had "based its decision solely upon representations made by the prosecutor that [the witness] felt intimidated by the presence of . . . four women in the courtroom." Id. at 775. Guzman does not announce a constitutional requirement that a trial court always question an intimidated witness before closing a courtroom. Cf. Cosentino v. Kelly, 926 F. Supp. 391, 398 (S.D.N.Y. 1996) (distinguishing Guzman as a case where the closure request was "essentially . . . based on speculation"). Waller imposes no such requirement, and rightfully so, as there are some situations in which further questioning of a frightened witness would be futile. The present case is not one in which the trial judge relied on wholly unsubstantiated and conclusory statements of a prosecutor in determining to close a

31

courtroom for an extended period. The record and history of this case – a brutal shooting, the witnesses' failure to immediately report the incident to police, and the witnesses' repeated testimonial flip-flops – substantiated the statements of the ADA, who explained that the witness had reaffirmed her prior grand jury testimony shortly before taking the stand. Significantly, the record shows that the witness would later admit, after again changing her testimony, that she had feared someone at the Fort Greene Housing Project might harm her because of her testimony. Given the unusual circumstances in which the request for a courtroom closure arose, this Court cannot conclude that the trial court committed constitutional error by failing to question the witness before closing the courtroom for a brief *voir dire*.

It also was not unreasonable for the state courts to find that the second requirement of <u>Waller</u> was met, that is, the closure was no broader than necessary to protect the interest at stake.[10] Again, this Court finds it compelling that the courtroom closure was limited to a nine-question *voir dire* of Lawrence regarding her invocation of the Fifth Amendment privilege. Lawrence gave no substantive testimony during the closure, the entire *voir dire* was on the record, and the court re-opened the courtroom when Lawrence eventually testified. Based on the totality of the circumstances, this Court finds that the closure was not overbroad. See <u>Bowden</u>, 237 F.3d 125 ("Our adoption in <u>Ayala</u> of a

---

[10] The Court is aware that the defendants' family members and friends were among those excluded from the courtroom. Yet, the closure was not overbroad in including them, as they were precisely the individuals whom Karen Lawrence feared most. It undoubtedly would have been futile for the trial court to have attempted to require the scared witness to point out in open court the spectators whom she feared. It was not unreasonable for the trial court to conclude that the situation did not warrant inquiry into the backgrounds of each member of the crowd. Obviously, as noted *supra*, a more substantial closure may have required a more compelling showing. However, in the case at bar, this Court simply cannot conclude that the extremely brief closure was fatally overbroad under <u>Waller</u> because it included the defendants' family members. See <u>Rodriguez v. Miller</u>, ___ F.3d ___, 2007 WL 2445120, at *5 (2d Cir. Aug. 29, 2007) ("<u>Waller</u> does not demand a higher showing before excluding a defendant's friends and family."); <u>Martin v. Bissonnette</u>, 118 F.3d 871, 875-76 (1st Cir. 1997).

sliding scale approach to the first <u>Waller</u> factor means that there will not always be a meaningful analytic distinction between the first and second prongs of the <u>Waller</u> test.").

The third prong of <u>Waller</u> requires that the trial court consider reasonable alternatives to closing the proceeding. When the closure is limited to begin with, as it was here, the trial judge is not obligated to *sua sponte* suggest and explore alternatives. <u>Ayala</u>, 131 F.3d at 71. As stated by the Second Circuit, it "becomes the obligation of the party objecting to the trial court's proposal to urge consideration of any further alternatives that might avoid the need for even a limited closure." <u>Id.</u> At trial, defense counsel never suggested an alternative to the brief closure of the courtroom, and accordingly, this Court looks no further.

<u>Waller</u>'s final prong requires the trial court to make findings adequate to support the closure. But, as the Fourth Circuit has stated, "the <u>Waller</u> Court prescribed no particular format to which a trial judge must adhere to satisfy the findings requirement, and we read nothing in <u>Waller</u> that would require a reviewing court to evaluate the trial judge's closure order solely on the basis of the explicit factual findings and, thereby, ignore facts of record which fully support the decision and belie a claim that [petitioner's] right to a public trial was actually violated by the closure." <u>Bell v. Jarvis</u>, 236 F.3d 149, 172 (4th Cir. 2000); <u>accord Carson v. Fischer</u>, 421 F.3d 83, 90 (2d Cir. 2005) (purpose of fourth <u>Waller</u> prong is simply to allow appellate court to determine whether closure was proper); <u>Bowden v. Keane</u>, 237 F.3d 125, 132 (2d Cir. 2001) (appellate court may glean from the record a trial court's justification for *a brief closure*); <u>United States v. Farmer</u>, 32 F.3d 369, 371 (8th Cir. 1994). While it certainly would have been advisable for the trial judge to have stated for the record his reasons for briefly closing the courtroom – *e.g.*, to explain the atmosphere of the courtroom and

33

demeanor of the intimidated witness – there is, nonetheless, sufficient detail in the record to support the courtroom closure actually ordered. Especially significant is the witness's later statement that she feared physical harm for testifying. With or without precise specification, clearly, it was not objectively unreasonable for the trial court to find that the statements of the prosecutor, corroborated by the unusual events that had already unfolded, warranted a very brief closure of the courtroom. Cf. Bowden, 237 F.3d at 131 ("The quality and extent of the evidence that will support a closure therefore will vary from case to case, depending on the scope of the closure."). Accordingly, the rejection by the state courts of petitioner's courtroom closure claim was not an objectively unreasonable application of Waller; nor was the decision to close the courtroom based on "an unreasonable determination of the facts in light of the evidence presented." Accordingly, under AEDPA, the writ must be denied on this claim.

## CONCLUSION

For the foregoing reasons, the petition of James Bumpus is dismissed and the writ is denied. When a petition is dismissed on procedural grounds, as is the case here for all but one of Bumpus's claims, the petitioner is entitled to a certificate of appealability if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Reasonable jurists could differ on whether petitioner presented all of his claims to the New York Court of Appeals, and on those claims, a certificate of appealability will issue. 28 U.S.C. § 2253(c)(2). Since petitioner has not made a substantial showing of the denial of a constitutional right

34

with regard to his courtroom closure claim, the certificate of appealability shall not extend to that claim.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Brooklyn, New York
September 6, 2007

ERIC N. VITALIANO
United States District Judge